J-A08031-16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| M.T.L., | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| L.P.Z., | : | |
| | : | |
| Appellant | : | No.   2919 EDA 2015 |

Appeal from the Order Entered October 13, 2015
in the Court of Common Pleas of Chester County
Domestic Relations at No(s): No. 08-13842.

BEFORE:  BOWES, OLSON, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:                **FILED JUNE 07, 2016**

L.P.Z. (Mother) appeals from the order entered October 13, 2015, which denied her request to modify the existing custody schedule and relocate with her minor children, V.L., born in March 1999, and R.L., born in June 2001 (collectively, Children).  We affirm.

The pertinent factual and procedural history of this case has been summarized by the trial court as follows.

> [M.T.L. (Father) and Mother] are parents of [Children]. The parties first litigated custody of their children in 2008, eventually resulting in an Order by the Honorable David Bortner entered May 14, 2010 granting the parties shared legal custody of [C]hildren, with Mother having primary physical custody and Father having partial custody.  Further litigation ensued on a frequent basis, mostly being resolved by (eventual) stipulation of the parties.  In September 2011, Father filed a Petition to Modify to which Mother filed a counterclaim for modification, and in November of 2012, Mother re-petitioned for modification, seeking to relocate to Toronto, Canada with [Children] for the 2013-2014 school year, which Father opposed.  Those matters

* Retired Senior Judge assigned to the Superior Court.

were resolved by the Honorable Ann Marie Wheatcraft's Order of May 2, 2013 (entered by agreement). Per that Order, Mother did not relocate to Toronto; Father has partial physical custody of [R.L.] during the academic year 5 nights out of 14, plus a two[-]hour dinner visit every other week, and alternating Sundays; and Father has physical custody of [V.L.] for the two hour dinner visit every other week. As of the May, 2013 Order, Mother and [C]hildren summer in the Toronto, Ontario area. During those summer breaks, Father has partial custody periods with R.L. (and V.L., if she is willing) every other weekend in Ontario, as well as three weeks of days of vacation [*sic*]. Father sees [V.L.] briefly on those weekends, but she does not accompany [R.L.] on vacations with [Father].

On June 30, 2015, Mother filed a [p]etition for [r]elocation, requesting to move to Canada full time with [Children]. After three days of hearings, [the trial court] denied Mother's petition.

Trial Court Opinion (TCO), 10/20/2015, at 1-2 (footnote omitted).

Mother filed a notice of appeal.[1] Both Mother and the trial court have complied with the directives of Pa.R.A.P. 1925.

On appeal, Mother claims that the trial court erred in: (1) denying Mother's request for relocation based upon the factors set forth in 23 Pa.C.S. §§ 5337(h) and 5328(a); (2) ordering the parties to attend reunification therapy "where its decision was based on evidence obtained outside the

---

[1] The trial court denied Mother's requests in the parties' presence on September 3, 2015 at the conclusion of trial. However, an order was not issued until October 9, 2015. Mother initially filed a notice of appeal and concise statement of errors complained of on appeal (Concise Statement) on or about October 1, 2015, averring she did so because she did not want to miss the 30-day deadline for filing an appeal. (*See* Mother's Brief at 7). Mother eventually amended her notice of appeal to reflect the official order denying relocation, entered by the trial court on October 9, 2015.

record;" and (3) failing to consider the custody evaluator's opinion regarding Children's residing in separate households. Mother's Brief at 4.

Once a custody order is in place, a court may modify it on petition "to serve the best interest of the child." 23 Pa.C.S. § 5338(a). In performing the best-interests analysis, a trial court is required to consider the factors set forth at 23 Pa.C.S. § 5328(a). *See E.D. v. M.P.*, 33 A.3d 73, 80 (Pa. Super. 2011) ("[W]hen a party files a petition for modification of a custody order, the trial court must perform a 'best interests of the child' analysis considering all of the section 5328(a) factors."). When a party seeks to relocate, he or she bears the burden of proving that relocation will serve the best interests of the child, as determined by consideration of the ten factors listed at 23 Pa.C.S. § 5337(h). In this case, with both relocation and modification at issue, consideration of both sets of factors was required. *See, e.g., A.M.S. v. M.R.C.*, 70 A.3d 830, 836 (Pa. Super. 2013) ("The trial court must consider all ten relocation factors and all sixteen custody factors when making a decision on relocation that also involves a custody decision.").

Following our review of the certified record, the briefs for the parties, and the relevant law, we conclude that the on-the-record discussion following the conclusion of testimony and the opinion of the Honorable

Katherine B.L. Platt correctly and concisely addressed each statutory factor.[2]

Accordingly, we adopt the trial court's conclusions as set forth on the record[3] and the court's October 20, 2015 opinion as our own, and affirm the trial court's disposition of Mother's issue that the trial court erred in denying relocation pursuant to 23 Pa.C.S.A. §§5337(h) and 5328(a). The parties shall attach redacted copies of the September 3, 2015 transcribed conclusions of the trial court and the October 20, 2015 opinion to this memorandum in the event of further proceedings.

Next, Mother argues that the trial court erred in ordering the parties and Children to attend intensive reunification therapy, when the court's decision was premised upon information outside the record. Mother's Brief at 29.[4] Specifically, Mother avers that the program which the trial court

---

[2] In doing so, we find Mother's specific argument that the "trial court failed to address 5328(a)(6), 'the children's sibling relationships,'" unpersuasive and not supported by the record. This Court finds the trial court premised part of its decision, especially when dismissing Mother's proposal to split Children, on the fact that there was "no emotional benefit" for separating Children, found that maintaining the "status quo" benefited "their **emotional** and educational opportunities" and that "having their family close at hand trumps." N.T., 9/3/2015, at 140-41. (emphasis added). Therefore, the trial court's statements made it clear that it considered the relationship of the siblings when deciding if Children should be separated from one another. *See M.J.M. v. M.L.G.,* 63 A.3d 331, 336 (Pa. Super. 2013)("[T]here is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations.").

[3] *See* N.T., 9/3/2015, at 116-142.

[4] Mother contends that following the trial court's on the record denial of Mother's request to relocate, Mother waited for the trial court to issue an

chose for reunification therapy was never "suggested, discussed, or considered" by any party and the trial court "relied on evidence outside the record to make a unilateral decision as to who[m] the parties and [Children] should work with towards the trial court's ultimate goal of family reunification." *Id.* at 29-30.

The trial court correctly noted that it may "as part of a custody order, require parties to attend counseling sessions. 23 Pa.C.S. § 5333(a)." Trial Court's Supplemental Opinion, 12/1/2015, at 74. In doing so, the trial court found that such therapy was appropriate for the entire family due to the effect "Mother's perception that she is the victim of abuse by Father" has on V.L. *Id.*

In support of her argument, Mother cites several decisions by this Court in which we have repeatedly stated that a trial court cannot consider

official order within the 15 days as prescribed by law. Mother's Brief 29. When no order was filed within that time, Mother prematurely filed her notice of appeal and Concise Statement. Mother avers that it was not until she received the trial court's October 9, 2015 order that she became aware of the intensive reunification program the trial court had chosen for the parties and Children to attend. *Id.* Mother attempted to amend her Concise Statement, which this Court denied. She then proceeded to file a second appeal in hopes of consolidating, which was dismissed by this Court. Mother's Reply Brief at 2. While this Court acknowledges that an appellant's failure to include an issue within its Concise Statement constitutes waiver, because of the peculiar procedural circumstances, Mother's attempt to remedy the situation, and the fact the trial court issued a supplemental opinion addressing this issue, we will discuss this issues on its merits.

evidence outside the record in making its determination in a particular case.[5]

Mother's Brief at 30. While Mother has cited accurate case law, binding on this Court, Mother fails to recognize that such law does not apply to the circumstances within this case.[6]

Here, the trial court stated on the record that it was in favor of reunification therapy, that it believed the whole family should participate, and that the court needed "to do [its] due diligence" before deciding on a reunification program. N.T., 9/3/2015, at 144. The trial court did not rely on evidence outside the record when determining if reunification therapy was appropriate in this case, as it had already stated in the parties'

---

[5] **See Ney v. Ney,** 917 A.2d 863 (Pa. Super. 2007) (finding the trial court incorrectly performed its own internet job search to determine if Father had presented accurate information regarding his inability to "find job openings in the region."). **See also M.P. v. M.P.**, 54 A.3d 950 (Pa. Super 2012) (holding the trial court erred in denying Mother's contested petition to travel to Ecuador based, in part, on the court's independent research on Ecuador's history of noncompliance with the Hague Convention.).

[6] We find Father aptly and accurately analyzed Mother's issue and her supporting case law when stating the following:

> Here, the trial court sought the appropriate remedy to address the evidence before it. It did not independently research for evidence to support its denial of relocation. For example, the trial court did not independently review psychological journals to determine whether intensive therapy is helpful in reunification cases. The custody evaluator was the appropriate expert who provided evidence on that issue. Rather, having decided that reunification therapy was warranted based upon the evidence before it, the trial court appropriately identified a program that could provide such therapy.

Father's Brief at 61.

presence, on the record, that it was in favor of such a program. The only independent research conducted was on particular programs, which the court already stated, without objection, it would be performing.[7] Because Mother failed to object when the trial court stated, in her presence, that the court would be conducting independent research, we find the issue waived.

Lastly, Mother avers the trial court erred when failing to consider the custody evaluator's opinion that Children would not adversely suffer if they were residing in separate households. Mother's Brief at 34. Mother contends the trial court's opinion and reasoning for denying Mother's proposal to move to Canada with "V.L., while Father assumes primary custody of R.L. during the school year" was based upon misstatements of evidence within the record. *Id.* Specifically, Mother notes testimony of the child custody evaluator, Jane Iannuzzelli (Ms. Iannuzzelli), who testified that Children had a strong relationship and that there would not be any problems, from a psychological perspective, in separating Children. N.T., 9/2/2015, at 134. Combined with Children's testimony that they could live apart, Mother avers "clearly the custody evaluator had no issue with [Children] living in separate households given that she testified as such and

---

[7] *See* N.T., 9/3/2015, at 144-145 (Discussing two particular programs the trial court stated that it had "not done any independent research into those," the court needed "to do [its] due diligence" and it had not "vetted" a proposed program yet; clearly Mother was aware that the trial court was researching programs and voiced no concern with the court doing so.). Even though the trial court inevitable chose a program that was not discussed at

recommended that each child remain in the primary custody of a different parent." Mother's Brief at 35.

In response, the trial court stated it had

> fully considered the testimony and recommendations of [Ms. Iannuzzelli], who performed an updated custody evaluation (having performed an earlier one in connection with the 2013 litigation). [The trial court] did in fact follow many of her recommendations. Contrary to the suggestion in this assignment of error, neither Ms. Iannuzzelli's testimony nor her report conclude[s] that there would be no adverse effect to [Children] living in two separate households in the event of relocation with [V.L.] only. By way of background, Mother proposed to Ms. Iannuzzelli (and to the [trial] court) that if she were not permitted to move to Canada with [Children], that she be permitted to move with V.L., leaving R.L. in Father's primary custody in Pennsylvania (with certain performance conditions). Ms. Iannuzzelli opined unequivocally that relocation to Canada was not in [Children's] best interests and stated that having parents living close together is "better prognostically for [Children] in terms of how they fare after a divorce." She also stated in her testimony that, regarding V.L., "I would be concerned that she was isolated from her brother and her [Father] by virtue of the move…". In her evaluation report [] Ms. Iannuzzelli indicated that she considered Mother's proposal to go to Canada with V.L. and leave R.L. with Father during the school year to be Mother's "actual proposal." As a result she reviewed the impact of the proposal on [Children] and rejected it as not being in their best interests. She did, however, recommend that both parents remain in the Philadelphia region and that Father have primary custody of R.L. Mother certainly never referenced the latter recommendation nor did she argue for it at trial.
>
> As to Ms. Iannuzzelli somehow endorsing the split long distance custody proposal, there is no support for that anywhere in the record. In her testimony, Ms. Iannuzzelli stated "And as far as R.L. is concerned, [M]other's proposal to me – now that I understand that – I'm not sure that's not where she is at this

---

trial, the record is clear that court was conducting independent research on reunifications programs.

point, I hope not, but that R.L. be – it was kind of an all or nothing proposal with [F]ather during the school year and all vacation time with [M]other is a very much an all or nothing proposal. I am hoping that has changed since then." It is clear that Ms. Iannuzzelli did not favor the long distance [split], and my ruling is consistent with that opinion.

TCO, 10/20/2015, at 9-11 (citations omitted).

We discern no abuse of discretion. In doing so, this Court finds the trial court adequately considered all evidence, including Ms. Iannuzzelli's report. Specifically, we note that Mother's alternative request to separate Children and relocate with V.L. was in direct contradiction to Ms. Iannuzzelli's unequivocal assertion that she did not "believe that the relocation is in [Children's] best interest." N.T., 9/2/2015, at 134.

Based on the above, we conclude that the record supports the trial court's determination to deny Mother's petition for relocation.[8] Accordingly, we affirm the order of the trial court.

Order affirmed.

J-A08031-16

Judgment Entered.

Joseph D. Seletyn, Esq.

ProthonotaryDate: <u>6/7/2016</u>

---

[8] Notably, Mother stated that she would remain in Pennsylvania if relocation was denied. **See** N.T., 9/3/2015, at 140 ("Given that [Mother] has said that if [the trial court did not] grant relocation, she will stay here…").

- 10 -

M.T.L.
Plaintiff

: IN THE COURT OF COMMON PLEAS

: CHESTER COUNTY, PENNSYLVANIA

v.

: CIVIL ACTION – LAW

L.P.Z.
Defendant

: NO. 2008-13842

: IN CUSTODY

## OPINION

Defendant L.P.Z. appeals to the Superior Court from this Court's Order of October 9, 2015[1] denying her Petition for Relocation. I write now in fulfillment of the mandate of Rule 1925(b) of the Pennsylvania Rules of Appellate Procedure.

## Background

Plaintiff I M.T.L ("Father") and Defendant ("Mother") are the parents of two children: V.L. , and R.L.

The parties first litigated custody of their children in 2008, eventually resulting in an Order by the Honorable David Bortner entered May 14, 2010 granting the parties shared legal custody of the children, with Mother having primary physical custody and Father having partial custody. Further litigation ensued on a frequent basis, mostly being resolved by (eventual) stipulation of the parties. In September of 2011, Father filed a Petition to Modify to which Mother filed a counterclaim for modification, and in November of 2012, Mother re-petitioned for modification, seeking to relocate to Toronto, Canada

---

[1] I ruled from the bench on September 3, 2015. The oral ruling was memorialized by Order of October 9, 2015.

1

with the children for the 2013-2014 school year, which Father opposed. Those matters were resolved by the Honorable Ann Marie Wheatcraft's Order of May 2, 2013 (entered by agreement). Per that Order, Mother did not relocate to Toronto; Father has partial physical custody of I R,L during the academic year 5 nights out of 14, plus a two hour dinner visit every other week, and alternating Sundays; and Father has physical custody of V.L for the two hour dinner visit every other week. As of the May, 2013 Order, Mother and the children summer in the Toronto, Ontario area. During those summer breaks, Father has partial custody periods with R.L (and V.L, if she is willing) every other weekend in Ontario, as well as three weeks of days of vacation. Father sees V.L briefly on those weekends, but she does not accompany her brother on vacations with their father.

On June 30, 2015, Mother filed a Petition for Relocation, requesting to move to Canada full time with the children. After three days of hearings, I denied Mother's petition.

Discussion

In a child custody case, the paramount concern is the best interests of the child. *Landis v. Landis*, 869 A.2d 1003, 1011 (Pa. Super. 2005). "This standard requires a case-by-case assessment of all of the factors that may legitimately affect the 'physical, intellectual, moral and spiritual well-being' of the child. When a custody dispute involves a request by a party to relocate, we have explained, 'there is no black letter formula that easily resolves relocation disputes; rather, custody disputes are delicate issues that must be handled on a

2

case-by-case basis.'" *C.M.K. vs. K.E.M.*, 45 A.3d 417, 421 (Pa. Super. 2012) (quoting *Baldwin v. Baldwin*, 710 A.2d 610, 614 (Pa. Super. 1998); *Landis*, *supra*).

The party proposing the relocation has the burden of establishing that the relocation will serve the best interest of the child. Each party has the burden of establishing the integrity of that party's motives in either seeking the relocation or seeking to prevent the relocation. 23 Pa. C.S.A. §5337(i)(1)(2).

In her Concise Statement of Errors Complained of on Appeal, Mother contends that:

**1. The Court erred in denying Mother's Petition for Relocation pursuant to the factors set forth in 23 Pa. C.S.A. §5337(h).**

Pursuant to 23 Pa. C.S.A. §5337(h), in determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life

3

for the child, including, but not limited to, financial or emotional benefit or educational opportunity. .

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

I considered each of the factors in Section 5337(h). I discussed each factor on the record and explained my reasons for finding that relocation was not in the best interests of these children (N.T. 9/3/15 at 133-141). Without reiterating every point covered by me in that discussion, I gave greatest weight to factors 2, 3, 5 and 8.

Regarding the second factor, I was greatly concerned about the disruption in the children's schooling, in that their current school is the 5th for V. L. ; and the 4th for R. L. since the family moved to Pennsylvania. V. L is 11th grade and is an outstanding student. I R. L also does well, but more importantly, he feels socially secure at his present school. With regard to the third factor, of great concern to me was the feasibility of preserving the fragile relationship between Father and V. C. , which I discuss at greater length below. As to the factor 5 pattern of thwarting conduct, and 8, motivation for the relocation request, the record is replete with instances of Mother stating that her desire to move is to distance her and the children from the perceived harassment she endures, and that she believes Father is behind it. She has made her beliefs known repeatedly to the children, and although . R. L does not believe it, V. L appears to have adopted it to some degree. I say "appears" to have because she has not said so explicitly to any person other

4

than in an email (Exh. F-9) which she sent to Father at her mother's suggestion, in which she states that she is afraid of him. In her interviews with the custody evaluator and with me, V.L denied that she had ever seen her father do harm or be abusive, did not state that she feared him, yet she was unwilling to reject her mother's perception. To Ms. Iannuzzelli, the custody evaluator, Mother acknowledged that "this may have made V.L's relationship with Father worse". (F-19, at page 8). Mother's stated motivation for escaping perceived harassment is belied by her admission that since she moved to Philadelphia in 2013, she has not been harassed there.

**2. The Court erred in denying Mother's Petition for Relocation pursuant to the factors set forth in 23 Pa. C.S.A. §5328(a).**

The factors to be considered when awarding custody pursuant to Pa. C.S.A. §5328(a) are as follows:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

5

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

I considered each of the factors in Section 5328(a). I discussed each factor on the record and explained my reasons for physical and legal custody, and why, given those reasons, the proposed relocation was not in the best interests of these children (N.T. 9/3/15 at 116-132).

I will not burden this opinion by restating everything I discussed on the record. However, the factors set forth in Sections 5328(a) 1, 3, 4, and 8 in weighed most heavily in my review of the impact of the proposed move on the children. The first custody factor is a variation on the theme of the 5th relocation factor, which I discussed briefly above. Mother does not overtly prevent either child from spending time with their Father, and she generally makes R.L available as called for in their agreed order. Mother does not prevent V.L from visiting with her father, but empowers the child to make this decision and supports her in it, which I find to be contrary to the child's best interests.

With regards to factor 3, preserving the relationship with the non-relocating parent, I considered the likelihood of that a move to Canada for V.L would be the death knell for her strained relationship with her father. As indicated by Jane Iannuzzelli, the custody evaluator, "I believe V.L's

6

relationship with her father is the one that would be at most risk, because it's very fragile as it is." (N.T. 9/2/15 at 163). R.L's relationship with his father is very deep and involved, and this, too, would necessarily be negatively impacted should he relocate to Canada.

Most significantly, I considered the fourth factor; the need for stability and continuity in the children's education, family life and community life. These children have moved repeatedly since their parents' separation in service to Mother's desire to avoid harassment or to find more suitable housing for them and her horses. The last move was in 2013 when Mother first sought to move to Ontario, then moved with the children to Philadelphia from her home. Both children told the custody evaluator and me that they want to "never move again" (although V.L wishes never to move once she moves to Ontario). The children have changed schools repeatedly, as well, which has caused significant social stress for each child. V.L, now an 11th grader, is not enthusiastic about her current social adjustment at School, but is an outstanding student. R.L has finally "found himself" socially at School and is doing adequately in his academic performance. It is difficult to imagine how changing schools again would benefit V.L and it is clear that it would be a devastating blow to R.L.

Mother initially petitioned to move to the Toronto area so that she could be closer to her beverage facility. Throughout her testimony, however, Mother made it made it clear that she would not be living in the house she had purchased near Toronto in 2013; she discussed possibilities of more northern

7

Ontario, or Ottawa, 4 hours from her plant, and even Vancouver, British Columbia, thousands of miles from her plant. She discussed multiple school possibilities, also in a variety of geographic areas in Canada, and it was apparent that Mother really did not have a plan. I am unwilling to sacrifice the obvious benefits of the good life that these children have in the greater Philadelphia region for Mother's impulsive desire to move on.

**3. The Court erred in denying Mother's Petition for Relocation pursuant to the factors set forth in 23 Pa. C.S.A. §5338, which provides that upon petition, a court may modify a custody order to serve the best interest of the child.**

After a protracted hearing and thorough review of all 26 of the statutory factors, I found that the best interests of the children would not be served by permitting Mother to relocate with the children to Canada, as relocation would disrupt the stability and continuity in the children's educational and community lives and their relationship with their father. The burden of proving the benefit of the move was Mother's, and she was not able to convince me that there was any benefit to the children at all.

**4. The Court erred in failing to consider all of the enumerated factors set forth in 23 Pa. C.S.A. §5328(a).**

As stated above, I considered each of the factors in Section 5328(a). I discussed each factor on the record and explained my reasons for finding that relocation was not in the best interests of the children (N.T. 9/3/15 at 116-132).

8

**5. *The Court erred in denying Mother's Petition for Relocation and reached a conclusion not supported by all competent evidence and testimony.***

I considered all of the evidence and testimony and assigned weight I deemed appropriate to that evidence and testimony. With regard to issues of credibility and weight of the evidence in child custody cases, the Super Court defers to the presiding trial judge who viewed and assessed the witnesses first-hand. *M.J.M. vs. M.L.G.*, 63 A.3d 331, 334 (Pa. Super. 2013). It was Mother's burden to prove that relocation serves the best interest of these children, a burden she failed to meet. Mother's assignment of error fails to indicate exactly which "competent evidence and testimony" my conclusion should have relied upon if it differs from that which I cited to support my decision. It should therefore be considered waived.

**6. *The Court erred in failing to explain why the recommendations and conclusions of the custody evaluator should not be followed. Specifically, the custody evaluator's opinion that there would be no adverse effect to the two children residing in separate households.***

I fully considered the testimony and the recommendations of the custody evaluator Jane Iannuzzulli, M.Ed., M.A., who performed an updated custody evaluation (having performed an earlier one in connection with the 2013 litigation). I did in fact follow many of her recommendations. Contrary to the suggestion in this assignment of error, neither Ms. Iannuzzelli's testimony nor her report conclude that there would be no adverse effect to the children living

9

in two separate households in the event of relocation with V.L. only. By way of background, Mother proposed to Ms. Iannuzzelli ( and to the court) that if she were not permitted to move to Canada with both children, that she be permitted to move with V.L., leaving R.L. in Father's primary custody in Pennsylvania (with certain performance conditions). Ms. Iannuzzelli opined unequivocally that relocation to Canada was not in the children's best interests (N.T. 9/2/15 at 134) and stated that having parents living close together is "better prognostically for the children in terms of how they fare after a divorce." (N.T. 9/2/15 at 160). She also stated in her testimony that, regarding V.L., "I would be concerned that she was isolated from her brother and her brother by virtue of the move..."(N.T.9/2/15 at 173). In her evaluation report (F-19) Ms. Iannuzzelli indicated that she considered Mother's proposal to go to Canada with V.L. and leave R.L. with Father during the school year to be Mother's "actual proposal". As a result she reviewed the impact of that proposal on the children, and rejected it as not being in their best interests. She did, however, recommend that both parents remain in the Philadelphia region and that Father have primary custody of R.L. (F-19, p. 28). Mother certainly never referenced the latter recommendation nor did she argue for it at trial.

As to Ms. Iannuzzelli somehow endorsing the split long distance custody proposal, there is no support for that anywhere in the record. In her testimony, Ms. Iannuzzelli stated "And as far as R.L. is concerned, mother's proposal to me -- now I understand that --I'm sure that's not where she is at this point, I hope not, but that R.L. be -- it was kind of an all or nothing proposal with

10

father during the school year and all vacation time with mother was very much an all or nothing proposal. I am hoping that has changed since then"(N.T. 9/2/15 at 175-176). It is clear that Ms. Iannuzzelli did not favor the long distance spit, and my ruling is consistent with that opinion.

**7. The Court erred in denying the relocation and failing to give appropriate weight to the older child's testimony that she preferred to relocate to Canada. The child was of a mature age, intelligent, and provided a well-reasoned opinion to the Court as to her desire to relocate.**

The child's preference is but one factor in Section 5337(h) and Section 5328(a). I recognize that V. L is 16 years old and highly intelligent. However, to my mind, her stated preference was not sufficiently "well-reasoned" that I could justify a relocation based on it. What she provided to me by way of explanation is that she likes Canada better (particularly the weather), doesn't have any friends at her current school (          ), and wants to stay with her mother.(N.T. 9/3/15 at 97). I am profoundly sympathetic to any teenager who has had a difficult time fitting in at school. But this 11th grader has attended 5 schools since moving to Pennsylvania, and adapting socially to yet another school is a huge risk-- a risk she did not acknowledge. Despite not having friends at School , she has close friends from her days at Previous Schools n. Even the comfort and companionship of those friends would be lost if she were to move to Canada. She sees no additional detriment to her nearly non-existent relationship with her father, nor does that concern her.

11

Based on V₀L's interviews with Ms. Iannuzzelli for the updated custody evaluation, I fully expected to hear that she was afraid of her father and wanted to move to Canada to distance her and Mother from the alleged harassment her mother believes is at her father's hands. There was no such testimony. This is not to say that testimony of that nature would have necessarily changed the result, but its absence left the remaining reasons sounding shallow and simplistic, not mature and well-reasoned.

8. *The Court erred in failing to give appropriate weight to Mother's reasoning and motivation that she needed to relocate because of continued harassment even after the Court found her to be a "victim."*

I stated that Mother sees herself a "victim" because she perceives "abuse" and "harassment" in even the most benign settings. As I stated on the record "[A] strong woman does not see abuse around every corner, does not say the word abuse and harassment every time someone disagrees with you. Reasonable, intelligent, sentient beings can disagree with each other and not be abusive. I'm pretty sure that you are sitting there right now and thinking that I'm being abusive to you and that I am victimizing you because I don't believe that [Father] is an abuser....and your victimology is pervasive to the point that you are teaching your daughter, I believe, that you are a victim and you are teaching her to be a victim." (N.T. 9/3/15 at 119, 118). This was not indicating that I believe that Mother is a victim. Rather that I believe that Mother sees herself as a victim and is teaching her daughter to be a victim by modeling that behavior and inculcating her perception that Father is the perpetrator. I did not

12

find that Mother is a victim nor that Father or anyone else has perpetrated any abuse or harassment upon her.

9. *The Court erred in failing to give appropriate weight to the financial benefit Mother would receive by relocating to Canada, when she testified that her company operated out of Canada and that her business suffered by being required to live in Pennsylvania.*

Mother started her beverage business in 2011 (N.T.9/1/15 at 31). Mother could have located this business operation anywhere, but made a conscious business decision to operate in the Toronto, Ontario, Canada area. She travels up to her plant approximately once per month, and lives within an hour of it when she and the children summer in Ontario. The business has yet to make money (N.T.9/1/15 at 155), but Mother is optimistic about its prospects. However, Mother's (and the children's) economic stability is in no way dependent on the financial success of the business. Mother received about $30 million in equitable distribution (N.T. 9/1/15 at 143-144). Father pays $40,000 per month in child support (N.T. 91/15 at 143). Mother's business is an admirable enterprise, but it does not pay the bills.

10. *The Court erred in concluding that the older child's best interests would not be served by allowing a relocation to Canada when it would significantly enhance Mother's ability to financially provide for her children.*

As stated above, Father pays $40,000 per month for the support of the parties' minor children and Mother is a multi, multi-millionaire. This is simply not

13

a case where relocation is necessary in order for a parent to financially provide for her children. Mother herself testified: "I'm not saying I have to move because of financial reasons." (N.T. 9/1/15 at 155).

11. *The Court erred in concluding that the older child's best interests would not be served by allowing a relocation to Canada due to the geographical distance from Father that it would present, when Father's current custody arrangement with the child was of a minimal amount, and the amount of time would not be further reduced by the relocation.*

The testimony was clear that V. L is estranged from her father. Nonetheless, Father has dinner with her (and R. L) every other Thursday night during the school year. He also sees her for five hours on Christmas and six hours on Father's Day (N.T. 9/2/15 at 37). He attends events at her school and is actively involved as a parent there. Although the amount of time Father spends with V. L is minimal, it is a regular part of her schedule, and a cherished part of Father's. It is the only time that Father can really have close personal contact with his daughter, who has steadfastly declined to allow him more. If Mother and the children moved to Canada, Father would only see V. L during summer vacations and possibly some holidays—if she would make herself available. That is a drastic change from having face-to-face contact with her every other week and seeing her at school events. *See S.J.S. vs. M.J.S.*, 76 A.3d 541, 551 (Pa. Super. 2013) (trial court did not err in denying Mother's Petition for Relocation where benefits to the children, the suburban neighborhood and excellent school, were not exclusive to the area where

14

Mother wanted to move, and did not outweigh the detrimental effect on Father's time and relationship with the children). As indicated above, Ms. Iannuzzelli characterized this father-daughter relationship as "fragile" and at "great risk". To place further impediments by means of distance is not beneficial. Mother has empowered V. L. to decide whether she will or will not see her father. Father fears that if she moves away and is only subject to Mother's influence on a daily basis, V. L. will chose not to visit with him even if he comes to Canada. Based on past history, this is not an unreasonable fear. Ms. Iannuzzelli was hesitant to call this Father's "last chance"; but I am persuaded that no additional obstacles should be placed in the way of what opportunities remain for re-building the relationship, however limited they may be.

**12. *The Court erred in failing to consider the financial circumstances of the parties in determining the feasibility of preserving the relationship between Father and the older child in the event she were to move to Canada.***

No issue was raised regarding the cost of long-distance visitation/partial custody arrangements. And had such an issue been raised, it would have been irrelevant. The parties have more than enough money to fund any possible permutation of custody arrangement, should such an arrangement be in the children's best interests.

**13. *The Court erred in denying the relocation for the older child who is now sixteen years old, when the prior reunification therapy that occurred for two years under the prior Custody Order failed, and basing***

15

*its decision upon the small hope that the child's relationship with Father would suddenly improve.*

Pursuant to Judge Wheatcraft's May 2013 custody, *V.L* and Father were to undergo reunification counseling with Dr. Wendy Branton. They did in fact undergo a course of that counseling, but as of June 2014, *V.L* refused to attend further. It is clear that the relationship between *V.L* and her father did not improve as a result of that counseling. However, I do not see that as a reason to justify relocation. Father has steadfastly tried to build a relationship with *V.L* . There is no evidence that Father has ever done anything physically or emotionally abusive or harmful to *V.L* -- indeed she confirms he has not. She did express to me a perception of having been less than top priority to her father when she was younger. When asked by me how she would have altered her father's role in the past she stated: "[I] would have had him pay more attention to me and less attention to his job or *R.L* or, you know, other things". (N.T. 9/3/15 at 106). I can understand if she carries with her a dread, from long ago, that somehow, she is not worthy of Father's time and attention. Father wants nothing more than to have a continuing opportunity to disabuse her of that belief, and there is no error in giving it to him.

Thus, I considered all of the evidence, including the prior reunification therapy. It was within my discretion to assign the appropriate weight to it. *M.J.M. vs. M.L.G.*, 63 A.3d 331, 334 (Pa. Super. 2013).

16

Based on the foregoing, the Order of October 9, 2015 denying Mother's Petition for Relocation was the proper relief in this matter and amply supported by the evidence.

BY THE COURT:

10/20/15
(date)

Katherine B. L. Platt,    J.

17

THE COURT: Okay. And ordinarily I would spend maybe 15 minutes talking about my time spent with the kids. I know your counsel was in the room and so they can fill you in on that. And I will be making some references I think probably to what they told me. Although there were no big surprises, I don't think. Everybody had a pretty good idea what preferences would be and so on.

So as I understand my legal obligation, it goes beyond considering the ten factors that the statute has for relocation. I, in fact, must consider all of the factors, what we call also the custody factors, as well as the relocation factors. So I am going to go through them. There is some duplication, so obviously if I address it in my first batch, I will not address it in the second batch.

Which party is more likely to encourage and permit frequent and continuing contact between the child and the other party. Again, I am going to try to keep this tailored to this relocation situation, but that is a general custodial factor. If I have to say one or the other, if this was a contest in that way, I would say that I think father is perhaps encouraging.

What I do see though is that by actions, at

least with regards to R.L, there is no resistence. There is no push/pull. You reached an agreement, that seems to have worked pretty well. And I have heard nothing that there is any effort on either party to mess with that arrangement or to throw any obstacles in the path.

With regards to V.L , I am a little troubled by, and these are my words and I do not use this as a term of art, this is strictly lay parlance, I sense a real passive aggression on L. P. Z part with regards to V.L's relationship with her dad. I don't think that L. P. Z is in any overt sense suggesting to V.L that she shouldn't have time with her dad, that she shouldn't value her relationship with her dad. I'm not saying that at all.

But what I am saying is that her sharing with V.L her concerns and her, what I will characterize, again, this is a layperson's terminology, paranoia, about M.T.L is a form, a very passive-aggressive form, of trying to convince her daughter that she should feel the way she feels. I think she is, L. P. Z , is much too smart, much too intelligent to actually come right out and say, you know, your father is a bad man. But instead she lays

out plate after plate of supposed evidence that he's a bad man and expects her daughter to eat from it.

The fact that V.L only sees her dad in the limited amount of time that she does, I believe at this point, is V.L's choice. I don't think it's L.P.Z. point. I don't think she wants to limit the relationship. I think she just wants her daughter to have the same disdain for M.T.L that she does. And she's only partly achieved that, because I think that V.L does have her eyes open to a certain extent.

What I'm going to say is this, and I will say it once and I hope I never say it again, your daughter is a -- likes to believe that she's a feminist. I believe that she is. She has a mother who should be, and I believe is, a terrific role model. You are intelligent, you are successful, you are articulate. You are everything that a young girl should look up to. Except that you are a victim. And your victimology is pervasive to the point that you are teaching your daughter, I believe, that you are a victim and you are teaching her to be a victim.

I gave her every opportunity to tell me that her father scared her or was mean to her or threatened

her or whatever. Gave her every opening. She did not give them to me at all. And yet I don't disbelieve at all that she has said those things in the past. Because I know I saw the letter that she wrote to her dad and I know that is consistent with what she's told Dr. Iannuzzelli and so on and so forth.

I need you to think, L.P.Z. , that if you want to raise a strong daughter, and I know that you do, that you give her the modeling of a strong woman. And a strong woman does not see abuse around every corner. Does not say the word abuse and harassment every time someone disagrees with you. Reasonable, intelligent, sentient beings can disagree with each other and not be abusive. I'm pretty sure that you are sitting there right now and thinking that I'm being abusive to you and that I am victimizing you because I don't believe that he is an abuser. And I don't believe that he is an abuser. But, I may be wrong. You may be wrong.

But I don't believe that you have the right to create in your daughter a fear by your behavior. If you were genuinely concerned about this -- I relooked at this situation. I saw that the allegations of harassment and threatening started way before you moved

to Pennsylvania. They have been going on for years. If there is someone out there who has it out for you, it's clearly been beyond when M.T.L was the bad guy. As he stated, and I thought it was rather succinct, for a long time he was the person who protected you from these -- who was expected to protect you from this harassment and now he is the source of it. How you deal with that is your business, unless you are impacting your daughter and her relationship with her father. Then it's my business. And if you want to raise a strong daughter, be a strong mom.

Now, the present and past abuse committed by either party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide for adequate physical safeguards and supervision of the child.

I have already put the rabbit in that hat. I've told you that I don't find anything on this record to indicate to me that M.T.L is an abusive person, that he has committed abuse within the meaning of the law, which, by the way, is very different from the definition of abuse which you have reiterated in your various correspondences. Might he be a controlling

person? That is possible. I haven't seen it, but I am prepared to believe it. In the type of business in which he is in, unless he was extraordinarily forceful it would be very hard for me to believe that he has reached the level he has. Can he be mean-spirited? That is possible. I haven't seen it, but I'm prepared to believe it. But I have seen nothing in the last three days and my review of the record that tells me that he is abusive.

The parental duties performed by each party on behalf of the child. Clearly, when each child is in the other's -- while each child is in the parents' possession each parent is doing their job and doing it well. I credit not only the testimony of the parties, but Ms. Iannuzzelli, who says that while they may have different parenting styles, they are both capable and competent parents. I am not relying on her opinion for that, but I am saying it supports my own observations. There are differences. Your styles are very different. I think that you both are very capable.

The need for stability and continuity in the child's education, family life, and community life. This is going to be a big one for the relocation, but let me talk about it now. Stability is very important.

The very fact that that factor appears not only in the custodial factors, but is implicit in the relocation factors indicates not only the legislatures, but I think to a certain extent social sciences reflection that stability is very important. Does that mean one can never move? Absolutely not. We are talking about stability in community, education, family life. The kids are going to have continuity in family life no matter what. It may look different, but it will be continuity. Education, these kids have bounced around in schools. And apparently that hasn't harmed them academically as far as I can see. But R.L. was really clear he has had it. This is it. He wants not to move ever again.

Now, V.L. is much more open. I think she sees herself a little more as a woman of the world. Be that as it may, they are children. And they're educational stability at this point as 16-year-old and 14-year-old is really important. And I am hesitant to disrupt it.

The availability of extended family. Extended family does not seem to play a very large role in my consideration here. M.T.L. has some family in Princeton. It doesn't seem to be the type of family

relationship where the grandparents are constantly there being quasi parents and I don't hold that against him or L.P.Z for her family not being close by. It's really not an issue as to either of them.

The well-reasoned preference of the child, based on the child's maturity and judgment. As predicted, V.L very much wants to go to Canada and R.L very much wants not to. I think that V.L 's explanations to me were well-reasoned. I had -- she didn't say anything about infrastructure. I was prepared to try and learn about that interest, but it was clear to me that her interests in Canada were two-fold; one, because I want to be with my mom. That was absolutely no question about that and I consider that well-reasoned. She loves her mom and wants to be with her mom. Considers her her best friend. What a wonderful thing to say. I love that.

The other reason was that she just really likes Canada and she thinks it's great. And there is nothing wrong with that either. That is perfectly well-reasoned. It wasn't to say she also indicated that she'd had some difficulty socially at School . And that would be a very important reason for me when she said I could start over. That is well-reasoned to

me. If you've had some difficulties, then wanting to reboot makes perfectly good sense. I buy that entirely.

So I felt that both kids, their preferences were not only clearly stated, but very soundly based, very rational. I haven't gone into all of R.L's reasons for staying, but the fact that he's just -- he feels like he's finally gotten into his groove. That is my term. He has friends that he really cares about. He has a school that he really loves. He feels, and again these are my words, not his, he's really in a good place. He feels happy with his life right now. And it's hard to say that is not well-reasoned. It's difficult to balance his happiness with her dissatisfaction. And that's one of the things we have to take into consideration.

The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm. I have already gone into this. I don't want to prolong it. But what I will say is that I do not believe that L.P.L is consciously trying to turn V.L against M.L. I think that she's not disabusing her daughter of any thoughts that she has. She may be, in fact, reinforcing

them. But, again, I will tell you that when given what, I think we were there almost a half-hour together, I gave her every opportunity to tell me why she didn't want to be with her dad, fear, harassment, all -- never came up. Not once.

In case it doesn't fit into the factors, I have to talk about yarn. I explored with ' V.L whether maybe part of her lack of interest in or lack of volition to do things with you, dad, was that you just didn't get her. That you didn't get what a 16-year-old girl is interested in or that 16-year-old girl is interested in. That it was easier -- I didn't say this, but in my mind I'm thinking -- easier for you to relate to what R.L's interested in because your interest so clearly coincide. It's easy. But you have never been a 16-year-old girl and never will be and you don't -- you didn't -- she's such a unique individual that it's not something that you can read about in books to figure out what this particular girl might be interested in, what would interest her.

I asked her point blank, well, okay if you could design something that you would tell your dad this is what I want to do on a Saturday afternoon and I would say -- I would make him do it, what would you say? And

she said, I don't know, maybe have him take me yarn shopping, but he would never do it. I said don't bet the farm. I said -- I opined that I thought perhaps that if she wanted to go yarn shopping, you would be willing to get on a plane and take her to wherever they are sheering the sheep. I mentioned that as an example of she didn't say to me there is nothing I could think of that I would ever ask my dad to do with me. But she did make it very clear that you weren't in tune with her interests. And that that is of longstanding, okay?

When I asked her where it all went wrong, again, not the exact words I used, she said, well -- I said if we could rewind the tape, where would we start it? She said, well, maybe if he spent less time with R.L and more time -- more attention to me and less time to his work and R.L That was her answer. I think that tells you pretty much everything you need to know. Except that when I asked her whether or not, okay, is it too late to fix that, her answer was, yes, it's too late to fix that. But then we had the discussion about yarn.

I think that her words and her intellect are such that she's built a wall. But she has -- the wall is not impenetrable and it may not be penetrable now. I

don't know. But she certainly didn't indicate that there would never -- that it was not capable of resolution. Maybe in a couple of years she said. Okay. I just want you to know that I'm perceiving that if there are things that you could do with your daughter that were of finite duration that were driven by her, that were things in which you had no interest but did it because she was interested in doing it, might be something that would improve your standing. If she were younger, I would say you would have to take her to bipity bopity boo and have the sparkles put on your face. Whatever it takes. She doesn't believe that you would do that. I do. But she does not. That is your job. Not mine.

Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs. I think you both are. I have no question that your love is enduring and appropriate for both of your children. That you have their interests fully in front of you at all times.

Which party is more likely to attend to the daily, physical, emotional, developmental, educational and special needs of the child. Again, I believe that

you are both fully capable of doing that. I think you have different approaches. I think L.P.Z would like me to anoint her the educational parent, maybe anoint you some other type of parent. But, in fact, you both do things in your own way and to your own extent. It's wonderful if either of you wants to be fully engaged in your children's activities or schooling. You don't have to be as engaged as the other in everything. I don't expect you to take tango lessons with your children, nor do I expect ı L.P.Z to do the history, the war stuff. You have your respective strengths and your children recognize them and appreciate them, as do I.

The proximity of residences of the parties. Not really an issue in what we are dealing with today, but Philadelphia and Berwyn are not difficult.

Each party's availability to care for the child or ability to make appropriate childcare arrangements. It sounds as though you both have your backup plans. I'm satisfied with them. I guess now is the time to talk about C.M . I feel that under the circumstances, having made inquiry through someone that you both trusted, namely C. ı and her husband, who vetted this young man to some extent and

found him trustworthy, that would be acceptable to me.

It was not acceptable to L.P.2 Whether or not you also had the opportunity to check out her limo drivers was an interesting point. You don't care. I'm not sure why it really matters if he wasn't behaving inappropriately, if he was driving well, delivered him on time and R.C didn't have a problem, I'm not sure where the issue is.

He wasn't -- all of the charges were expunged. Even if they were expunged, even if this was a young man who had been in a bar fight at some point and had a disorderly conduct that wasn't expunged, I don't find this particularly troubling that the person with whom he works -- can't remember his name -- D? D, finds him reliable enough that he not only background checked him, but recommended him to you says a lot to me.

So I think that L.P.2 is maybe more vigilant in that regard. And that is fine. To the extent that she wants to vet things, that is fine. But I don't expect it. I don't require it and I don't consider it a minus in that particular instance.

The level of conflict between the parties and willingness and ability of the parties to cooperate with

one another. Well, you know, what can I say? That is the heart of the long-term nature of this matter. Your conflict is really interesting to me because you are such remarkable people and I find you both to be really admirable and remarkable people in so many ways. The way in which you are conflictual is quite interesting to me. And it makes it harder to deal with.

I will say this, I think you both talk about trying to work things out. I think that ' L.P.Z doesn't believe that you hear her. But I also believe that she doesn't trust what you say when given enough in an attempt to respond to her. And I have reviewed a lot of those e-mails trying to see if they were in your face and snarky and offensive, let alone abusive. I didn't find it.

I found them highly restrained. I also found them often a lot more wordy -- not wordy, but maybe that you bent over backwards to explain everything chapter and verse, which I think backfired. I don't think it was done out of an effort to be abusive. I think you were just trying to be clear. But apparently that is not a good method and I am not sure what a good method is at this point. She accuses you of not listening. I would also say I think you do listen. I think you're

reading everything that you said and you are replying generally appropriately.

But there may be between the lines things that you're not getting. It's not your fault, but I think she is expecting you to answer things that are between the lines, because she's had that history with you. You were together for a long time. And I think that's missing.

I know that L.P.Z. is not a fan of coparent counseling. So I'm not going to recommend it because you have been there, done that and I'm not wasting anyone's time with that. I think it could be very, very useful, but only if the parties are invested in it. Clearly they are not.

So in terms of the level of conflict. Just as I'm reviewing what has been submitted to me in the last couple of days, I would say that the conflict is there. I think that L.P.Z is very, very defensive. I'm not sure you are very good at diffusing it. And I don't have a solution for it.

A history of drug or alcohol abuse of a party or a member of a party's household. Ms. Iannuzzelli went into that when asked why she didn't consider it in her updated report. She said nobody made an issue of

it. Nobody made an issue of it here either. There may have been a situation, what, three or four years ago when one of the children reported that dad had consumed some alcohol at breakfast or something like that and maybe he went into a room and closed the door.

M.T.L. was asked about it. And he indicates that because he has gout, his consumption of alcohol has to be extremely constrained. I find that credible. I personally do not have gout, but I am familiar with a number of people who do, and I know that it's more effective than the Antabuse. I find that credible and I certainly -- I didn't ask the children about it, but they didn't volunteer anything about it either.

The mental and physical condition of a party or a member of a party's household. I have seen nothing that indicates to me that there's -- certainly no diagnoses have been floating around. Ms. Iannuzzelli didn't reference anything. I did not read the earlier custody evaluation. I saw no need to do it. So I have no idea what is in it. But I don't think that that is a factor that really plays into this relocation case at all. Any other relevant factor will just send me over to the relocation factors.

The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the non-relocating party, siblings, and other significant persons in the child's life. Okay, where it says child, please read children. And an unusual case and the reason that you are here and haven't settled this matter is that the interests of R.L and V.L are not necessarily in sync. So I'll have to deal with them separately in terms of dealing with that.

You both are as involved as you can be given the circumstances with your children. And I would say that L.P.Z has been very creative about finding activities for the children to be involved in that get them outside of their little cocoon-ish environment. I think -- she didn't say this, but I interpreted that she has concerns that R.L may only be inside himself or keep within the very small, narrow interests and not have as much physical activity, and so on and so forth, as a young man might want or need.

He was pretty clear that he doesn't have a lot of outside physical activities, but that he does love to go for walks -- that he loves walking, not only out in Berwyn, but in Center City. And we talked about

his itineraries and if I were a city kid, that is what I would be doing too. I found that wonderful. Because not only does it give him physical activity, but it's a world of wonder. And it's a completely different world of wonder than the one he has out near the reserve -- or preserve. So I credit mom for her wanting to promote that though and not resting on laurels where it would be easy to let this young man go into his solitary activities and not come out.

It's clear though that the things that he does with his gaming and his YouTube, they have social motivation. They're not internal. They are for public consumption and that, I think, is a very important thing. So, reflecting that, I think you both do a pretty darn good job with that.

For V. L., her relationship with her mom is really special. It's very deep. And I interpreted her desires to move to Canada to be, first and foremost, so that I can be with my mom. She didn't talk about what would happen if she didn't move to Canada. I think the presumption was there that she would be with her mom and I think we all agree on that. There is no scenario I am seeing here where V. L. doesn't remain in her mom's primary custody. And I think that that is

important to her.

We have talked about the relationship with dad and where it needs improvement and certainly it's a heartbreak. I tried to get her to comprehend it a little more outside of herself to try and be somewhat objective about it. I didn't get real far. But it was interesting talking to her about it. She was willing to engage in the effort.

The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child. Okay. Physical, educational, emotional development. There are some differences as to between the children, so I need to discuss those.

I think it's really hard for any child to move as an 11th grader. Now, is that a prejudgment or a -- what is the word I am looking for? I'm sorry, it's been a long day. Is that absolute? No, of course not. But I think that one of the things that V.L needs to know is that if things aren't working out great, simply picking up and moving is not always the answer. And that has kind of been the -- that has been the course of conduct for years. Don't like it? Pick up

and move. Don't like it? Pick up and move. Don't like it? Pick up and move. I think maybe as an 11th grader she's old enough to say, it's not perfect? Make the best. Make the best of it.

I don't want to dismiss her desire that it's -- the fantasy of starting over is really wonderful. But I also think that the idealism of starting over can be matched by the idealism of dealing with whatever you have got in front of you and making the best of it and seeing if you can't come out on top. I'd like to see her demonstrate that, because she is an incredibly talented young woman.

With regards to R.L, he just so clearly does not want a change. He doesn't want to move. He is exhausted. And all of the evidence I heard is that he's in such a good place right now, to change him from this place would be a disaster. I really believe that. It would be such a disservice to him at this time. Would it be a disservice to ' V.L. not to allow her to move? I don't think so, as long as she gets to stay with her mom. And that is what I would anticipate.

The feasibility of preserving the relationship between the non-relocating party and the child through suitable custody arrangements. You all

have provided me with a wonderful number of options and considerations and I sincerely appreciate it. I appreciate that you all were willing to think outside the box, even though you have a particular box you want to put forward to me, and I am deeply grateful for that. It speaks really highly of both of you.

However, I also believe that allowing V.L to go to Canada right now would be a terrible disservice to her relationship with her dad. Yes, and I appreciate the concept between actually on paper giving him more time then he has currently. I stand with M.T.L. and with Ms. Iannuzzelli, I don't believe it would happen. You think Judge Platt's driving up to Ottawa or Toronto or Vancouver to make this happen? I don't think so. And she knows it. However, I do think that having a more V.L -focused time with her and having her design it might be something worth exploring.

So, for so many reasons, the ability to maintain that relatively tenuous relationship right now I think couldn't be replicated if we're talking about even the relatively generous amount of time you are talking about in terms of trying to compensate. I appreciate the offer to make that. But I don't think that it could realistically achieve what needs to be

achieved, because it's too much in . V,L control. Yes, it's in her control here, but at least she is here. And not having, even those two hours -- is it every week or every other week?

MR. HOFSTEIN: Every other one, your Honor.

THE COURT: Even two hours every other week, just keeping that close proximity, if it's gone, it's gone.

The child's preference, taking into consideration the age and maturity. I think I have fully covered that.

Whether there is an establish pattern of conduct of either party to promote or thwart the child and the party, I think handled that fully.

Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity. There is no question that L.P2 strongly believes and heartfeltedly believes that her quality of life will be improved by a move to Canada. And I credit that as sincere. The difficulty that I have is that it doesn't -- I can't figure out, other than emotional, and I am not discounting that that is a valuable component,

there is no financial advantage, there is no educational opportunity that is an advantage.

So let's deal with the emotional. I honestly believe that, based on historic patterns, that there will be allegations of harassment and abuse no matter where she lives. Fortunately, Philadelphia has been exempted from that and that is, as far as I am concerned, a pretty good reason to stick around.

However, the emotional -- I fully credit *L.P.Z* · that she would feel safer and more comfortable in Canada. I see it. I understand it. I believe it. So I will give her that factor, if you will. I fully credit her on that factor. I'm just saying I don't see that that overcomes the fact that it disrupts the children, that it interferes with their schooling, it changes the entire landscape and that as of right now, even right now, the thought of where and what school is still very much a work in progress. I also credit that part of that is her willingness to give *M.T.L.* some input on what schools might be possible. However, I think that I'm seeing this as a move to escape rather than a move for any particular purpose. And that's my concern.

Whether the relocation will enhance the

general quality of life for the children, including, but not limited to, financial, emotional, or educational opportunity. I don't believe that this factor -- that there is any benefit to the children to moving to Canada at this point. Given that L . P 2 has said that if I do not grant the relocation, she will stay here, there is no benefit in Canada that I can perceive that I have been able to latch onto that exceeds any benefits to the children here.

They have excellent education here. They have each other here. They have their mom and their dad here. They have their horses here, when the horses are here. They would have their horses -- the horses there if she were there. But R.L says he thinks the weather there is better and so does V.L ,. Having spent some time in the area there in the winter, I would disagree, but that's irrelevant because it's not a big factor for either of them.

There is no emotional benefit. They would accept the fact that they were separated, if they were separated. Neither of them thinks it's wonderful, but nether of them thinks it's the end of the world if they be separated. R.L· would clearly be distraught if he were in Canada. And we know that there is no financial

benefit to them to go to Canada.

So all of those things together tell me that really maintaining the status quo in Pennsylvania benefits their emotional and educational opportunities, superior to Canada at the present time. With no disrespect to the educational system in Canada, which is excellent. With no disrespect to the cultural qualities of Canada, which is excellent. But having their family close at hand trumps.

The reasons and motivations of each party for seeking or opposing relocation, I think both of you are sincere. I really don't want to go into that in any real depth, because I believe L.P.Z when she says she will feel safer there and I believe M.T.L when he says he fears the total deterioration or loss of his relationship with his daughter if they move. Those are sincere. And they are not of ill-motive.

Nine is abuse. I have covered that.

Ten, any other factor. And I have no other factors that I wish to discuss.

There are some cases that I have in relocation where I say to myself if this relocation doesn't happen, whose heart will be broken. And in this case I don't know if anyone's heart will be broken. But

I know L.P.Z will be very disappointed. I don't think either of the children's heart will be broken as long as mom is close by. Which is good.

I think that V.L will be disappointed, because I think she has emotionally invested in moving. But she is a very talented young lady and I believe that she can do great things, not only at School, but in life. And I sense that confidence from her. R.L was absolutely pleased as punch that he's in a world the recognizes his nonconformity as an asset, as a valued asset. And I attribute that pride to both of you. Congratulations on that.

All right. As you have discerned, but I have not stated absolutely, I am denying the request for relocation. I don't want to split these children. They have both said it would be okay, but I don't want to split them. I see no need to split them. You had mentioned some little tweaking and I will take a look at that. Did you have any objections to the tweaks?

MR. LADOV: I do, your Honor. Respectfully, there was no counterclaim or anything else filed. We filed our petition to relocate. We asked for modification dealing with the driver issue and the medical issue.